

2001 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

6-7-2001

# Roadway Pkg Sys Inc v. Kayser

Precedential or Non-Precedential:

Docket 99-1907

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2001

Recommended Citation

"Roadway Pkg Sys Inc v. Kayser" (2001). *2001 Decisions.* Paper 125.
http://digitalcommons.law.villanova.edu/thirdcircuit_2001/125

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2001 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed June 7, 2001

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

NO. 99-1907

ROADWAY PACKAGE SYSTEM, INC.

v.

SCOTT KAYSER d/b/a QUALITY EXPRESS
Scott Kayser, Appellant

On Appeal From the United States District Court
For the Eastern District of Pennsylvania
(D.C. No. 99-mc-00111)
District Judge: Honorable John R. Padova

Argued: September 13, 2000

Before: BECKER, Chief Judge, NYGAARD and
AMBRO, Circuit Judges.

(Filed: June 7, 2001)

       LAURENCE I. TOMAR, ESQUIRE
        (ARGUED)
       Ballow & Tomar
       419 S. Oxford Valley Road
       Fairless Hills, PA 19030

       Counsel for Appellant

        FRANK C. BOTTA, ESQUIRE
        ELLEN P. MILCIC, ESQUIRE
         (ARGUED)
        Thorp, Reed & Armstrong, LLP
        One Oxford Centre
        301 Grant Street
        Pittsburgh, PA 15219

        Counsel for Appellee

OPINION OF THE COURT

BECKER, Chief Judge.

This is an appeal from an order of the District Court vacating an arbitrator's award. Plaintif f Roadway Package System, Inc. (RPS) ships small packages for corporate clients. "Independent linehaul contractors," such as Defendant Scott Kayser, assist in its operations. RPS terminated Kayser's contract in 1998, alleging that he had failed to fulfill his obligations under the Linehaul Contractor Operating Agreement (LCOA), which governed their association. Kayser exercised his contractual right to demand arbitration and was awarded substantial damages. RPS then brought suit in the District Court for the Eastern District of Pennsylvania, asking the court to vacate the award. Applying the vacatur standards set forth in the Federal Arbitration Act (FAA), the District Court granted the motion on the grounds that the arbitrator exceeded the scope of his authority. We will affir m.

Kayser's appeal requires us to decide two questions of considerable significance for the law gover ning arbitration, both of which are currently the subject of circuit-splits. The first question is whether contracting parties may opt out of the FAA's default vacatur standards and fashion their own. Because the LCOA is a "contract evidencing a transaction involving commerce," 9 U.S.C. S 2, the FAA governs this case. Resolving a question previously r eserved by this Court, we first hold that the FAA per mits parties to contract for vacatur standards other than the ones pr ovided in the FAA. The FAA sets out "a substantive rule applicable in

2

state as well as federal courts," Southland Corp. v. Keating, 465 U.S. 1, 16 (1984), but its rule is simply that courts must enforce the terms of private arbitration agreements.

The second question we must decide involves the conceptually complex issue of how courts should determine whether parties have contracted out of the F AA's default rules. The LCOA contains a generic choice-of-law clause, stating that it "shall be governed by and construed in accordance with the laws of the Commonwealth of Pennsylvania." Kayser submits that we should r ead this clause as expressing a desire to opt out of the FAA's default regime and to incorporate arbitration rules borrowed from Pennsylvania law. We disagree.

We first explain why the choice-of-law clause sheds little, if any, light on the parties' actual intent. The issue before us is simply a matter of contract construction rather than one of choice-of-law. Because choice-of-law clauses are designed to deal with a different issue from the one with which we are currently faced, and because few federal statutes other than the FAA permit parties to contract out of their requirements, we do not r ead the LCOA's choice-of-law clause as evidencing a clear intent to displace the FAA's default regime. Our conclusion is consistent with Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995), and though Volt Information Sciences, Inc., v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468 (1989), may appear to the contrary, our r eview of that opinion, the Supreme Court's subsequent decision in Mastrobuono, and the unanimous holdings of six other Courts of Appeals convince us that Volt is distinguishable.

Because the presence of a generic choice-of-law clause tells us little (if anything) about whether contracting parties intended to opt out of the FAA's default standards and incorporate ones borrowed from state law, we must announce and apply a default rule. We hold that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default regime. This rule will: (1) ensure that parties who have never thought about the issue will not be found to have elected out of the FAA's default regime; (2) be comparatively simple for arbitrators and

3

district courts to apply; and (3) preserve the ability of sophisticated parties to opt out. Applying our rule to this case, we conclude that the District Court was corr ect to apply the FAA's vacatur standards.

Analyzing the issue under those standards, we hold that the District Court correctly determined that the arbitrator exceeded the scope of his authority. Though our cases caution against exploiting an ambiguity in an arbitrator's award to support an inference that he or she exceeded his or her powers, they also establish that a reviewing court is not precluded from examining an arbitrator's statement of reasons. In this case, the arbitrator's written opinion makes crystal clear that his decision was based on the fact that he thought that RPS's procedures for notifying Kayser of its dissatisfaction with his performance wer e unfair. Yet the intrinsic fairness of RPS's procedur es was not before the arbitrator--he was empowered to decide only whether the termination was within the terms of the LCOA. Accordingly, we conclude that the District Court was corr ect in vacating the award, and will, therefore, affirm its order.

I.

A.

RPS and Kayser entered into the LCOA in 1996. It required Kayser to conform to specified service and safety standards, and permitted early ter mination if he did not meet them. RPS terminated the LCOA in mid–1998, alleging that Kayser had repeatedly failed to fulfill his obligations under the contract.

The LCOA is forty-one pages long and is divided into sixteen sections. This appeal implicates Sections 9 and 16. Section 9.3 binds the parties to arbitrate disputes and outlines the procedures for doing so. Its introductory sentence provides:

> In the event that RPS acts to terminate this Agreement . . . and [Kayser] disagrees with such termination . . . then each such disagreement (but no others) shall be settled by arbitration in accordance with the

Commercial Arbitration Rules of the American
Arbitration Association . . . .

Section 9.3(e) states:

The arbitrator shall have the authority only to conclude
whether the termination of [Kayser] was within the
terms of this Agreement, to deter mine damages if
required to do so under this subparagraph, and to
provide for the division of the expenses of the
arbitration between the parties. . . . If the arbitrator
concludes that the termination was not within the
terms of this Agreement, then, at the option of RPS . . .
(2) [Kayser] shall nevertheless be ter minated, and . . .
shall be entitled to damages equal to the arbitrator's
determination of what [Kayser's] net ear nings . . .
would have been during the period between the date of
termination to the last day of the ter m of this
Agreement, (without any renewals). [Kayser] shall have
no claim for damages in any other amount, and the
arbitrator shall have no power to award punitive or any
other damages.

Finally, Section 9.3(f) specifies:

The arbitrator shall have no authority to alter , amend
or modify any of the terms and conditions of this
Agreement (including by application of estoppel, waiver,
or ratification), and further, the arbitrator may not
enter any award which alters, amends or modifies the
terms or conditions of this Agreement in any form or
manner (including by application of estoppel, waiver , or
ratification).

Section 16 contains a generic choice–of–law pr ovision,
stating that the LCOA "shall be governed by and construed
in accordance with the laws of the Commonwealth of
Pennsylvania."

B.

Following RPS's termination of the LCOA, Kayser
demanded arbitration, which was conducted befor e William
Mechmann. Kayser sought $141,961.40 in total damages:
$129,930.00 for projected lost profits plus $12,031.40 for

5

expenses incurred in purchasing a tractor –trailer at RPS's request. Arbitrator Mechmann ruled for Kayser and awarded $174,431.15 in damages--$32,469.75 more than Kayser originally requested.

Mechmann's written decision consists of twelve short paragraphs. The first is irrelevant to this appeal. The second paragraph acknowledges that "[t]he arbitrator's authority is set forth in Section 9.3(e) [of the LCOA]." The third characterizes the "[t]he main question" before Mechmann as whether RPS's termination of the LCOA was "wrongful or proper." The fourth, fifth, sixth, and seventh paragraphs of the opinion focus on RPS's procedures for notifying independent contractors when it is dissatisfied with their performance and discuss the manner in which those procedures played out in Kayser's case. They read as follows:

> The RPS procedure for dealing with per formance by its contractors is commendable. [sic] Documentation of breaches by the contractors are written up by Local Managers. This is only verbalized to the contractor . . . .

> [Kasyer] bought larger equipment at the behest of RPS and took on that financial responsibility, but when his performance was unsatisfactory, he only received verbal warnings until the point of ter mination which of course, is written. He is aggressive with war ehouse people in several locations to get in and out to serve other . . . customers. When his own driver employees were remiss, he replaced them once RPS brought a problem to his attention. He was an aggr essive business man in a very competitive environment. Verbal warnings did not persuade him of RPS's serious concerns.

> Based on many years of dealing with industrial relations jurisprudence in American business, Ifind the RPS system lacking in due process towar d [Kayser].

> Here the RPS system, which I respect, blinds itself into thinking – as long as we document our side of the business arrangement, that is sufficient. For a reputable business organization that per forms an important service in the economy, that is inadequate.

6

Paragraph eight gives Mechmann's conclusion:

> I conclude that this was wrongful ter mination by RPS of the LCOA and determine the contractor's ear nings (after payment of all expenses which are bor ne by contractor) according to LCOA Section 9.3(e). As Section 9.3(e) provides, the damage period her e runs from 05/21/98, the date of RPS's termination of the LCOA to 01/25/99, the normal date of ter mination of the present Agreement (LCOA).

Paragraph nine, without explanation, sets Kayser's damages at $174,431.15. Paragraphs ten, eleven, and twelve are not relevant to this appeal.

C.

RPS then filed suit, asking the District Court to vacate or modify the arbitrator's award.1 The District Court granted RPS's motion, holding that: (1) the FAA, not Pennsylvania law, supplied the standards for judicial r eview of the arbitrator's decision; and (2) the arbitrator had exceeded his authority under the contract. In light of this conclusion, the Court did not reach RPS's other prof fered bases for vacatur. Kayser appeals. We have appellate jurisdiction under 28 U.S.C. S 1291. We review a district court's ruling on a motion to vacate an arbitration award de novo. See Kaplan v. First Options of Chicago Inc., 19 F .3d 1503, 1509 (3d Cir. 1994).

II.

We must first decide whether the District Court properly applied the FAA's vacatur standards or whether it should have, as Kayser submits, used those laid out in the Pennsylvania Uniform Arbitration Act (PUAA). For reasons

_____

1. The Federal Arbitration Act does not cr eate federal question jurisdiction. See Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 25 n.32 (1983). But because RPS is a Delaware corporation and Kayser is a citizen of New Jersey (and because the amount in controversy requirement is met in this case), the District Court had diversity jurisdiction under 28 U.S.C. S 1332.

we set forth in the margin, the answer to this question
could be quite important to the ultimate disposition of this
case.2 We have no tr ouble in determining that this case is

_____

2. The FAA lists four circumstances where a court may grant vacatur
and three under which it may correct or modify an award. Vacatur is
governed by 9 U.S.C. S 10(a). It pr ovides that a court may vacate an
award if: (1) it "was procured by corruption, fraud, or undue means," id.
S 10(a)(1); (2) the arbitrator was "partial[ ] or corrupt[ ]," id.S
10(a)(2); (3)
the arbitrator unjustifiably refused to postpone the hearing, refused to
consider "evidence pertinent and material to the controversy," or engaged
in any other "misbehavior" that prejudiced the rights of a party, id.
S 10(a)(3); or (4) the arbitrator "exceeded[his or her] powers, or so
imperfectly executed them that a mutual, final, and definite award upon
the subject matter submitted was not made," id. S 10(a)(4). Some courts,
including this one, have also recognized additional, nonstatutory bases
upon which a reviewing court may vacate an arbitrator's award under
the FAA. See generally Tanoma Mining Co. v. Local Union No. 1269, 896
F.2d 745, 749 (3d Cir. 1990) (r ecognizing that an award may be set aside
if it displays "manifest disregard for the law"); Swift Indus., Inc. v.
Botany
Indus., Inc., 466 F.2d 1125, 1134 (3d Cir . 1972) (noting that an
arbitrator's award must meet the test of fundamental rationality).
Correction and modification under the FAA are covered in 9 U.S.C. S 11,
which empowers courts to act: "(a) Where there was an evident material
miscalculation of figures or an evident material mistake in the
description of any person, thing, or property r eferred to in the award[;
or]
(b) Where the arbitrators have awarded upon a matter not submitted to
them . . . ."

Pennsylvania arbitration law is governed by the PUAA, which sets forth
two discrete regimes. The first is known as "statutory arbitration," under
which the standards for vacatur, modification, and correction parallel
almost perfectly those of the FAA. Compare 42 Pa. Con. Stat. S 7314(a)
(governing vacatur), and id. S 7315(a) (covering modification and
correction), with 9 U.S.C. S 10(a)(vacatur) and id. S 11 (modificationand
correction). The second regime is known as"common law arbitration."
Judicial power to set aside common law arbitration awards is sharply
circumscribed. See 42 Pa. Con. Stat.S 7341 (stating that such awards
"may not be vacated or modified unless it is clearly shown that a party
was denied a hearing or that fraud, misconduct, corruption or other
irregularity caused the rendition of an unjust, inequitable or
unconscionable award"). The PUAA provides that an agreement to
arbitrate "shall be conclusively presumed" to be a common law
arbitration "unless the agreement to arbitrate is in writing and expressly
provides for" statutory arbitration pursuant to the relevant statutory
chapter. Id. S 7302(a). Neither the LCOA's arbitration clause nor its

8

governed by the FAA. Subject to a few exceptions not implicated here, the statute applies to any "written provision in any . . . contract evidencing a transaction involving commerce to settle by arbitration a controversy arising out of such contract or transaction." 9 U.S.C. S 2. This language "extend[s] the Act's r each to the limits of the Congress' Commerce Clause power[.]" Allied–Bruce Terminix Cos., Inc. v. Dobson, 513 U.S. 265, 268 (1995). The agreement to arbitrate in this case––one between citizens of different states and involving a contract for the delivery and pick-up of packages that have been or will be shipped interstate––was unquestionably within Congr ess' power to reach under the Commerce Clause.

Our inquiry is not ended, however, simply because we have concluded that the FAA applies. Congr ess enacted the FAA "to overcome courts' refusals to enforce agreements to arbitrate." Id. at 270. The statute's ultimate purpose is to enforce the terms of private arbitration agreements. See 9 U.S.C. S 2 (providing that such agr eements "shall be valid, irrevocable, and enforceable, save upon gr ounds as exist at law or in equity for the revocation of any contract"); see also Dean Witter Reynolds Inc. v. Byrd , 470 U.S. 213, 220 (1985) (observing that the statute "was motivated, first and foremost, by a congressional desir e to enforce agreements into which parties had entered"). Though the FAA generally embraces a "proarbitration policy," this policy "does not operate without regard to the wishes of the contracting parties." Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52, 57 (1995). Thus, if parties contract to arbitrate pursuant to arbitration rules or procedur es borrowed from state law, the federal policy is satisfied so long as their agreement is enforced. See Volt Info. Sci., Inc., v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468, 478 (1989).

_____

choice of law clause mentions the PUAA (much less a particular chapter), so this would be a common law arbitration if Pennsylvania standards apply. And because the PUAA's vacatur standar ds for common law arbitration awards are so much narr ower than the FAA's, the choice of standards issue could well be dispositive in this case.

9

The foregoing does not mean that agreements specifying that arbitration will be conducted pursuant to state rules or procedures cease being subject to the F AA; it means simply that the FAA permits parties to "specify by contract the rules under which . . . arbitration will be conducted." Id. at 479. When a court enforces the terms of an arbitration agreement that incorporates state law rules, it does so not because the parties have chosen to be governed by state rather than federal law. Rather, it does so because federal law requires that the court enfor ce the terms of the agreement. Cf. Mastrobuono, 514 U.S. at 58 (inquiring "what the contract has to say about the arbitrability of petitioner's claim for punitive damages" rather than whether the agreement was controlled by a New York rule barring arbitrators from awarding them).

Having previously reserved the thr eshold question, see Apex Fountain Sales, Inc. v. Kleinfeld, 818 F .2d 1089, 1094–95 & n.4 (3d Cir. 1987), we now hold that parties may agree that judicial review of an arbitrator's decision will be conducted according to standards borr owed from state law. The FAA creates "a substantive rule applicable in state as well as federal courts," Southland Corp. v. Keating, 465 U.S. 1, 16 (1984), but Volt and Mastr obuono clarified that its rule is simply that courts must enforce the ter ms of arbitration agreements. We now join with the gr eat weight of authority and hold that parties may opt out of the FAA's off-the-rack vacatur standards and fashion their own (including by referencing state law standards). 3 This holding makes it

_____

3. See, e.g., Lapine Tech. Corp. v. Kyocera Corp., 130 F.3d 884, 888 (9th Cir. 1997); Syncor Int'l Corp. v. McLeland, No. 96–2261, 1997 WL 452245, at *6–7 (4th Cir., Aug. 11, 1997) (per curiam) (unpublished opinion); Gateway Tech., Inc. v. MCI T elecomm. Corp., 64 F.3d 993, 996–97 (5th Cir. 1995); M & L Power Servs., Inc. v. American Network Int'l, 44 F. Supp. 2d 134, 141 (D.R.I. 1999); New England Util. v. Hydro–Quebec, 10 F. Supp. 2d 53, 63 (D. Mass. 1998); Flexible Mfg. Sys. v. Super Prods. Corp., 874 F. Supp. 247, 248–49 (E.D. W is. 1994); Flight Sys. v. Paul A. Laurence Co., 715 F. Supp. 1125, 1127–28 (D.D.C. 1989). But see UHC Management Co. v. Computer Science Corp., 148 F .3d 992, 997 (8th Cir. 1998) ("It is not clear . . . that parties have any say in how a federal court will review an arbitration award when Congress has ordained a specific, self-limiting procedure for how such review is to occur.").

10

necessary for us to decide a truly difficult question--
whether Kayser and RPS did so in this case.

III.

We first consider whether RPS and Kayser manifested a
clear intent that any judicial review of the arbitrator's
award would be conducted pursuant to standar ds borrowed
from Pennsylvania law. Though our ultimate goal is to
effectuate their intent, we have little evidence with which to
work. Section 9.3 of the LCOA binds them to r esolve any
disputes "by arbitration in accordance with the Commercial
Arbitration Rules of the American Arbitration Association."
Section 16 directs that the LCOA "shall be governed by and
construed in accordance with the laws of the
Commonwealth of Pennsylvania." The LCOA itself says
nothing about the issue before us, and ther e is no extrinsic
evidence that RPS and Kayser gave the matter any
consideration. All we have to guide us, ther efore, is an
arbitration clause and a generic choice-of-law clause.

We do not believe that provisions such as these
demonstrate a clear intent to displace the F AA's vacatur
standards and replace them with ones borr owed from
Pennsylvania law. Choice-of-law clauses are ubiquitous in
commercial agreements, and with good r eason. Contract
law is mostly state law, and it varies from state to state. As
a result, parties to commercial agr eements often care a
great deal about which state's law will gover n their
association. And because modern choice-of-law doctrines
tend to place great weight on intent, contracting parties
have an incentive to include choice-of-law clauses in their
agreements. Commercial parties often also bargain for
arbitration clauses, hoping to benefit from arbitration's
purported advantages over litigation. As a r esult, many
commercial contracts include both choice-of-law and
arbitration clauses.

When required to determine the legal standards
governing a particular controversy, courts typically confront
two choice-of-law questions. The first is the horizontal
question: whether the laws of State X or State Y supply the
relevant rule of decision. Choice-of-law doctrines (and,

11

consequently, choice-of-law clauses) speak to this issue. The second choice-of-law question that courts face is the vertical one: whether the rule of decision is supplied by the laws of State X or by federal law. Judge-made choice-of-law doctrines (and, accordingly, attempts by contracting parties to influence their application with choice-of-law clauses) have no applicability to answering this question because the relevant rule is supplied by the Constitution itself: a valid federal law preempts any state law purporting to regulate the same issue. See U.S. Const. Art. VI.

The issue before us, however, is not one of choice-of-law or preemption--it is simply a matter of contract construction. No one contests that were this matter governed by state law, then the relevant rule would be supplied by the laws of the Commonwealth of Pennsylvania. But, as we have explained, this case is not governed by state law--it is governed by federal law. The only reason we must decide whether to apply federal or state standards in this case is because the FAA permits parties to "specify by contract the rules under which . . . arbitration will be conducted." Volt, 489 U.S. at 479. The issue in this case is whether the LCOA's generic choice-of-law clause should be read as specifying that any judicial review of the arbitrator's decision should be conducted according to the standards set forth in Pennsylvania arbitration law instead of those set out in the FAA.

We decline to construe the choice-of-law clause in this case as evidencing a clear intent to incorporate Pennsylvania's standards for judicial review into the LCOA. As we explained above, choice-of-law clauses are generally intended to speak to an issue wholly distinct from the one with which we are currently faced. Moreover, because few (if any) federal statutes other than the FAA even permit parties to opt out of the standards contained in them, we are confident that this particular issue rarely occurs to contracting parties ex ante.

We find support for our conclusion in Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995), which involved a dispute between a securities broker and two of its customers. The parties had agreed to resolve any disputes by arbitration and had indicated a desire to have

12

their agreement "governed by the laws of the State of New York." Though the FAA permits arbitrators to award punitive damages, the question before the Supreme Court was whether the parties had intended to incorporate into their agreement a New York rule that barred arbitrators from awarding them.

The Court began by examining the choice-of-law clause "in isolation." Id. at 59. It noted that the clause could "reasonably be read as merely a substitute for the conflict-of-laws analysis that otherwise would determine what law to apply to disputes arising out of the contractual relationship," id., i.e., whether to apply the laws of New York or those of another state. If this reading was the correct one, the Court observed, then "there would be nothing in the contract that could possibly constitute evidence of an intent to exclude punitive damages claims." Id. The Court also stated that even if the choice-of-law clause was intended to be "more than a substitute for ordinary conflict-of-laws analysis" it still "might not preclude the award of punitive damages because New York allows its courts, though not its arbitrators, to enter such awards." Id. Because of this, the Court reasoned that "the provision might include only New York's substantive rights and obligations and, not the State's allocation of power between alternative tribunals." Id. at 60.

Though never resolving which interpretation of the choice-of-law clause was the best one, the Court squarely held that it did not clearly evidence an intent to opt out of the federal default rule that arbitrators may award punitive damages and replace it with one borrowed from New York law that they may not award them. See id. (remarking that the choice-of-law clause was "not, in itself, an unequivocal exclusion of punitive damages claims"); see also id. at 62 ("At most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." (emphasis added)). Mastrobuono thus supports our conclusion that the LCOA evidences no clear intent to displace the FAA's default standards for judicial review and to replace them with those borrowed from Pennsylvania law.

13

Our conclusion that RPS and Kayser have expr essed no clear intent as to whether the District Court should have applied federal or state vacatur standards is not undermined by Volt Information Sciences, Inc. v. Board of Trustees of Leland Stanford Junior University, 489 U.S. 468 (1989). In that case, the underlying contract included both an arbitration clause and a choice-of-law clause. See id. at 470. A California court interpreted the contract to mean that the parties had intended to incorporate California's arbitration rules into their agreement, see id. at 471-73, and the Supreme Court of the United States affirmed. Though the contractor "devote[d] the bulk of its argument to convincing [the Supreme Court] that the [California court had] erred in interpreting the choice-of-law clause," it stressed that "the interpretation of private contracts is ordinarily a question of state law, which this Court does not sit to review." Id. at 474 (emphasis added). The Court acknowledged that it might have needed to review the state courts' interpretation had that interpr etation infringed upon federal rights, but explained that the only"right" conferred by the FAA is to have private arbitration agreements enforced according to their terms. See id. at 474-76. And, said the Court, because the Califor nia courts had found that the parties meant to incorporate the California rules into their agreement, applying those rules to their case was perfectly consistent with the policies of the FAA. See id. at 475.

We do not view Volt as of fering guidance as to how generic choice-of-law clauses should be interpreted; rather, the Court merely followed its obligation to defer to state court constructions of private agreements in cases where no federal rights are at stake. This supposition is supported by Mastrobuono, where the Court was reviewing a federal court's construction of a choice-of-law clause. Responding to Justice Thomas's dissent, which relied heavily on Volt, the Court clarified that in that case it had not construed the contract de novo. See Mastrobuono, 514 U.S. at 60 n.4. Instead, said the Court, it had "deferred to the California court's construction of its own State's law." Id.

Our understanding of Volt is bolster ed by case law from our sister circuits. Six other Courts of Appeals have

14

expressly considered the relationship between Volt and Mastrobuono. All six have unanimously concluded that Volt is inapposite when a federal court is unconstrained by the need to defer to state court constructions. See Painewebber, Inc. v. Elahi, 87 F.3d 589, 594 n.5 (1st Cir. 1996); National Union Fire Ins. Co. v. Belco Petroleum Corp., 88 F.3d 129, 134 (2d Cir. 1996); Porter Hayden Co. v. Century Indemnity Co., 136 F.3d 380, 383 n.6 (4th Cir . 1998); Ferro Corp. v. Garrison Indus., Inc., 142 F.3d 926, 936 (6th Cir. 1998); UHC Management Co., Inc. v. Computer Sciences Corp. , 148 F.3d 992, 996 (8th Cir. 1998); W olsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1212-13 (9th Cir. 1998).4 Volt therefore contains nothing that undercuts our conclusion that RPS and Kayser expressed no clear intent to incorporate Pennsylvania standards of judicial review into their agreement.

IV.

Because the presence of a generic choice-of-law clause tells us little (if anything) about whether contracting parties intended to opt out of the FAA's default standards and incorporate ones borrowed from state law, we need to establish a default rule, and the one we adopt is that a generic choice-of-law clause, standing alone, is insufficient to support a finding that contracting parties intended to opt out of the FAA's default standards. W e first lay out three considerations that inform our analysis, articulate why the

_____

4. We acknowledge that there ar e decisions to the contrary, but we find them to be of little value. Many of the cases wer e decided before Mastrobuono clarified the meaning of Volt. See Barbier v. Shearson Lehman Hutton, Inc., 948 F.2d 117 (2d Cir . 1991); Flexible Mfg. Sys. Ltd.,
v. Super Prod. Corp., 874 F. Supp. 247 (E.D. Wis. 1994); Flight Sys. v. Paul A. Laurence Co., 715 F. Supp. 1125 (D.D.C. 1989); Smith Barney, Harris Upham & Co., Inc. v. Luckie, 85 N.Y .S.2d 193 (1995); Thomson McKinnon Secur., Inc. v. Cucchiella, 594 N.E.2d 870 (Mass. App. Ct. 1992). Other decisions, though decided after Mastrobuono, never so much as cite the decision and tend to focus on pr eemption rather than contract construction. See ASW Allstate Painting & Constr. Co., Inc. v. Lexington Ins. Co., 188 F.3d 307 (5th Cir. 1999); Ekstrom v. Value Health, Inc., 68 F.3d 1391 (D.C. Cir. 1995); M & L Power Servs, Inc. v. American Networks Int'l, 44 F. Supp. 2d 134 (D.R.I. 1999).

15

rule we announce today is consistent with them, and show why our rule is in line with case law from both the Supreme Court and six of our sister cir cuits. We then respond to the alternative approach proposed by Judge Ambro. We conclude by applying our rule to this case.

A.

Three considerations guide us in formulating a default rule. First, we aim to minimize the frequency with which parties will be found to have opted out of the F AA's default regime when they did not intend to do so. This guidepost is consistent with the Supreme Court's admonition that the FAA standards control "in the absence of contractual intent to the contrary." Mastrobuono, 514 U.S. at 59. It is also consonant with the FAA's raison d'etr e, which is to overcome rules (whether created by state legislatures or by courts) that make it more difficult to enforce arbitration agreements. See Volt, 489 U.S. at 478 ("The FAA was designed `to overrule the judiciary's long-standing refusal to enforce agreements to arbitrate.' ") (quoting Dean Witter Reynolds Inc. v. Byrd, 470 U.S. 213, 219-20 (1985)). We acknowledge that some states provide as much or more protection to arbitration agreements than does the FAA, see, e.g., 42 Pa. Con. Stat. S 7302 et seq, but others do not, see, e.g., Garrity v. Lyle Stuart, Inc., 386 N.Y.S.2d 831, 832 (1976) (construing New York law as pr ecluding arbitrators from awarding punitive damages). The F AA's ultimate goal is to enforce parties' actual bargains, but any default rule is doomed to be inaccurate in some cases. We must, therefore, decide which error is worse: wrongly concluding that parties intended to opt out, or wrongly concluding that they did not. In light of the FAA's history, we believe that the former is worse than the latter.

Second, we strive to create a regime under which it will be easy for arbitrators and district courts to deter mine whether parties have opted out of federal standar ds. Finally, we seek to create a rule that sophisticated parties may bargain around without significantly increasing their transaction costs.

In light of these guideposts, we believe that the best rule is that a generic choice-of-law clause, standing alone, raises

16

no inference that contracting parties intended to opt out of the FAA's default regime. This rule will ensure that parties who have never thought about this particular issue--a characterization that, we suspect, would apply to the parties in this case--will not be found to have opted out. It will also make life easier for both arbitrators and judges because the analysis will be complete once they conclude that an agreement contains nothing more than a generic choice-of-law clause. In contrast, any other rule would often require a protracted analysis to determine whether the parties have contracted out of the default federal standards, a process that would impose two burdens: (1) it would make cases harder to decide for both arbitrators and judges; and (2) the resulting legal uncertainty might deter settlements.

Lastly, the rule we announce will preserve and facilitate the ability of parties to contract around the default federal standards. Sophisticated parties (i.e., those who employ experienced lawyers to draft their contracts) will soon learn that a generic choice-of-law clause is not enough. Assuming that both parties genuinely wish to be gover ned by standards other than the FAA's, r equiring something more will impose minuscule transaction costs. It is not particularly difficult, for example, to pr ovide that "any controversy shall be settled by arbitration in accordance with the terms of the Pennsylvania Unifor m Arbitration Act." Cf. Ford v. Nyclare Health Plans of the Gulf Coast, Inc., 141 F.3d 243, 246 (5th Cir. 1998) (noting that the parties' contract provided that "[a]ny contr oversy . . . shall be settled by arbitration in accordance with the T exas General Arbitration Act").5 We note also that any other rule would impose transaction costs as well by impelling parties not wishing to opt out to include a provision saying that their choice-of-law clause should not be read to raise such an inference.

_____

5. We do not mean to suggest that parties may not be found to have opted out unless their contract includes a statement such as this one. We hold only that a generic choice-of-law clause, standing alone, raises no such inference. The case might well be dif ferent if other contractual language or other evidence suggested that the parties intended to be bound by standards borrowed from state law.

17

Our rule is also consistent with the case law. First, it honors Mastrobuono's directive that FAA standards apply "in the absence of contractual intent to the contrary." 514 U.S. at 59. As we have explained, there is good reason to believe that contracts often contain both generic choice-of-law and arbitration clauses in cases where it is likely that the parties gave absolutely no thought to opting out of the FAA's default standards.

Second, the rule we announce today is in synch with Mastrobuono's holding. We acknowledge that that opinion concludes with a discussion that is premised on the assumption that the presence of a choice-of-law clause can render a contract ambiguous as to whether the parties intended to incorporate state arbitration rules into their agreement. See id. at 63-65. The Court, however, was careful to make clear that it was rendering no holding as to the meaning of the clause itself. See, e.g., id. at 62 ("At most, the choice-of-law clause introduces an ambiguity into an arbitration agreement that would otherwise allow punitive damages awards." (emphasis added)). 6 Third, our holding is in accord with decisions by six of our sister circuits that declined to construe a generic choice-of-law clause as raising an inference that the contracting parties

_____

6. It is for this reason that Mastr obuono's invocation of contra proferentem to justify its decision is not inconsistent with the rule we announce here. The party that drafted the contract at issue in that case contended that it incorporated a New York rule that precluded arbitrators from awarding punitive damages. Near the end of its opinion the Court stated that the drafter could not "over come the common-law rule of contract interpretation that a court should construe ambiguous language against the interest of the party that drafted it." Id. at 62. But
as we explained in the text, the Mastrobuono Court assumed without deciding that the agreement was ambiguous. Consequently, Judge Ambro is incorrect in arguing that, under Mastrobuono, "a generic choice-of-law provision not electing any specific law in the same agreement, is ambiguous." Ambr o Op. at 32 (emphasis added). Under our holding today, a generic choice-of-law clause is insufficient as a matter of law to show that the contracting parties intended to displace the FAA's default rules. As a result, the contract is not legally ambiguous, and contra proferentem is inapplicable.

18

intended to incorporate state law arbitration standards into their agreement.7

B.

Judge Ambro proposes a differ ent approach, arguing that contracts containing generic choice-of-law clauses and arbitration clauses should be construed as incorporating all state arbitration rules that are "pr ocedural" in nature and "substantive" state arbitration rules that do not "conflict" with the FAA. See Ambro Op. at 29-30. We are unconvinced, believing that the reasons outlined above that counsel in favor of the rule we announce today. Additionally, we have three problems with Judge Ambro's pr oposal.

First, Judge Ambro's proposal is based on the false premise that we must find a way to "r econcile[ ]" Volt and Mastrobuono. Id. But as we explained, supra at Part III, the Supreme Court has already clarified the relationship between the two cases. In Volt, the Court followed its rule of deferring to state court interpretations of private contracts so long as no federal rights are at stake. The Court had no such obligation in Mastrobuono because that case (like this one) originated in federal court. See Mastrobuono, 514 U.S. at 60 n.4; see also Volt, 489 U.S. 474-76. Judge Ambro is apparently unconvinced by Mastrobuono's method of distinguishing Volt, see Ambro Op. at 27 & n.2, but whether we find Mastr obuono persuasive or not is of no moment. It is not the province of this Court

_____

7. See Painewebber, Inc. v. Elahi, 87 F.3d 589, 592, 594 (1st Cir. 1996); National Union Fire Ins. Co. v. Belco Petr oleum Corp., 88 F.3d 129, 132, 134-35 (2d Cir. 1996); Porter Hayden Co. v. Century Indemnity Co., 136 F.3d 380, 382 (4th Cir. 1998); Ferro Corp. v. Garrison Indus., Inc., 142 F.3d 926, 927-28, 937 (6th Cir. 1998); UHC Management Co., Inc. v. Computer Sciences Corp., 148 F.3d 992, 994, 997 (8th Cir. 1998); Wolsey, Ltd. v. Foodmaker, Inc., 144 F.3d 1205, 1209,1212-13 (9th Cir. 1998). But see ASW Allstate Painting & Constr. Co., Inc. v. Lexington Ins. Co., 188 F.3d 307, 310 (5th Cir. 1999) (per curiam) (concluding otherwise); Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1394-96 (D.C. Cir. 1995) (same). We are unpersuaded by ASW and Ekstrom for a simple reason: neither opinion gives any reasons for concluding that a generic choice-of-law clause should be read as evidencing an intent to opt out of the FAA's default regime.

19

to craft a rule based on an assumption that the Supreme Court was wrong or that it could not have meant what it said. As we noted earlier, numerous cases have examined the interrelationship between Volt and Mastrobuono. See supra pp. 14-15 & n.5. We have not located, nor has Judge Ambro cited, a single case that "reconciled" the Court's two opinions on the basis proposed by Judge Ambro.

The second reason for our disagreement with Judge Ambro's proposal is that we believe that it would not effectively advance its stated purpose of effectuating the intent of most contracting parties. Judge Ambro concludes his concurrence by arguing that "custom and practice among contract drafters" counsel in favor of construing contracts such as this one as incorporating arbitration standards borrowed from state law. Ambro Op. at 35. But that would not happen even under Judge Ambro's approach; rather, Judge Ambro's approach would have courts construe contracts like this one as incorporating all state arbitration rules that are "procedural" in nature, but only those "substantive" rules that do not "conflict" with the FAA. Though reasonable people may quarrel over whether most parties to contracts such as the one before us would wish to be bound by the FAA's default standards or would instead choose to be bound by standards borrowed from state law, we think it most unlikely that any sizeable number of parties would wish to be bound by some federal standards and some state ones.

Lastly, we believe that Judge Ambro's proposal would unduly complicate the law in this area. Under Judge Ambro's approach, arbitrators and courts seeking to determine whether a given rule was supplied by the FAA or was instead borrowed from state law would first need to classify the relevant rule as being either "substantive" or "procedural" for purposes of the FAA.8 It is possible that

_____

8. Although Judge Ambro cites two Pennsylvania cases for the proposition that standards of review are procedural, we think that this would have to be a question of federal law. Judge Ambro's view is that a generic choice-of-law clause incorporates all of the chosen state's arbitration law except those portions whose incorporation would be inconsistent with federal law, i.e., substantive rules that "conflict" with

20

arbitrators and courts would simply import the distinctions that have been drawn in the diversity context pursuant to Erie Railroad Co. v. Tompkins, 304 U.S. 64 (1938), but the jurisprudence in that area is not always a model of clarity, and, at all events, we do not understand why distinctions drawn in a totally different context would necessarily transfer well to the FAA.

The problematic nature of Judge Ambr o's proposal would only increase in any case where the party seeking vacatur complained about multiple issues, at least one of which was "procedural" and at least one of which "substantive" (however those terms are defined). In such a case, a reviewing court could be required to apply some rules borrowed from state law (i.e., "pr ocedural" rules and the relevant state's "substantive" rules that do not conflict with the FAA) and some rules taken from the F AA (i.e., "substantive" rules where the rule fr om the relevant state is in "conflict" with the FAA). Issues involving vacatur are difficult enough without the additional challenge of balancing and applying multiple legal regimes within the same case. For all of these reasons, we decline to adopt Judge Ambro's proposal.

C.

Applying our rule to the facts of this case yields an simple answer. The LCOA contains only a generic choice-of-law clause and there is no extrinsic evidence of an intent to contract out of the FAA's default regime. We therefore hold that the District Court was correct in concluding that the FAA standards of review govern this case.

_____

the FAA. As a consequence, under the r egime proposed by Judge Ambro, the categorization of a given rule as "substantive" or "procedural" would in large part determine whether it was preempted by the FAA. In our view, because the scope of the preemptive ef fect of a federal statute is itself a question of federal law, the question whether a given rule was "substantive" or "procedural" for purposes of the FAA would likewise be a question of federal law.

21

V.

Applying the FAA standards, we agr ee with the District Court that the arbitrator exceeded the scope of his authority. Though judicial review under the F AA is "narrowly circumscribed," Local 863 Int'l Bhd. of Teamsters v. Jersey Coast Egg Producers, Inc., 773 F.2d 530, 533 (3d Cir. 1985), the scope of an arbitrator's authority is defined and confined by the agreement to arbitrate, see, e.g., Swift Indus., Inc. v. Botany Indus., Inc., 466 F .2d 1125, 1131 (3d Cir. 1972). Accordingly, the FAA provides that a court "may make an order vacating [an] award . . . [w]here the arbitrators exceeded their powers." 9 U.S.C.S 10(a)(4).

It is undisputed that the only issue presented to the arbitrator was whether RPS's "termination of [Kayser] was within the terms of [the LCOA]." The District Court found that the arbitrator exceeded his powers, and it is manifest that the court's conclusion was based on the text of the arbitrator's written decision, the relevant portions of which are set out in pages 6–7 of this opinion. The court noted that the arbitrator had "fram[ed] the issue as one of wrongful or proper termination" and then "proceed[ed] to discuss the inadequacy of RPS' procedur e for warning independent contractors of performance deficiencies and finally conclude[d] that `the RPS system[is] lacking in due process toward the Claimant contractor .' " Dist. Ct. Op. at 14 (quoting Arb. Op.). The court str essed that "[t]he arbitration provision clearly limits the arbitrator's authority to decide only whether the termination was within the terms of the Agreement, not to examine the fairness of the extrinsic procedures by which RPS notifies contractors of problems." Id. It concluded that"[b]y grounding his decision on such considerations of fairness and thereby altering the Agreement to require certain pre-termination procedures, the arbitrator overstepped the bounds of the authority granted to him by the Agreement." Id. at 14–15. On appeal, RPS essentially adopts the District Court's analysis.

Kayser advances three arguments in r esponse. He rightly notes that Mechmann was not required to justify or rationalize his decision. See Local 863, 773 F.2d at 534. He also correctly observes that the arbitrator was entitled to

make suggestions that went beyond the scope of his authority to decide. See Apex Fountain Sales, Inc. v. Kleinfeld, 818 F.2d 1089, 1095 (3d Cir . 1987). Finally, though acknowledging that the arbitrator made "r eference to due process issues," Kayser stresses the eighth paragraph of Mechmann's decision, which states:"I conclude that this was a wrongful termination by RPS of the LCOA." Kayser argues that Mechmann did not, "in the final analysis, tie his reference to the due process issues into his decision." Instead, Kayser claims, "the reference to due process [was] simply surplus, [was] irrelevant to Mr. Mechmann's decision and should not have been used as a basis by the court to suggest that the Arbitrator went beyond his authority." Appellant's Br . at 14-15.

Before parsing the arbitrator's opinion to determine whether he exceeded his authority, we must first confront the question whether it is proper to do so. Kayser does not argue that courts are barred fr om examining an arbitrator's statement of reasons, and, at all events, such a contention would be contrary to our cases. See United States Steel & Carnegie Pension Fund v. McSkimming, 759 F .2d 269, 271 (3d Cir. 1985) (vacating an arbitrator's awar d that ordered the payment of pension benefits where an examination of the arbitrator's written decision convinced the Court that "the arbitrator's award [was] patently based on statutory interpretation rather than the Plan"); see also Pennsylvania Power Co. v. Local Union #272 of the Int'l Bhd. of Elec. Workers, 886 F.2d 46, 49 (3d Cir . 1989) (concluding that a particular dispute was not arbitrable and remarking that "[n]othing in the arbitrator's two rulings convinces us to the contrary" because the opinions revealed that the arbitrator had based his decision "on the general desirability of arbitration" rather than the language of the agr eement).

On the other hand, we have also cautioned against exploiting "an ambiguity" in an arbitrator's decision to support "an inference" that he or she exceeded his or her authority. NF&M Corp. v. United Steelworkers of Am., 524 F.2d 756, 759 (3d Cir. 1975). The r eason for this policy is that "[t]o require opinions fr ee of ambiguity [could] lead arbitrators to play it safe by writing no supporting opinions. This would be undesirable, for a well-reasoned opinion

23

tends to engender confidence in the integrity of the process and aids in clarifying the underlying agreement." United Steelworkers of Am. v. Enterprise Wheel & Car Corp. , 363 U.S. 593, 598 (1960).

We distill the following principles fr om our precedents: (1) a reviewing court should presume that an arbitrator acted within the scope of his or her authority; (2) this presumption may not be rebutted by an ambiguity in a written opinion; but (3) a court may conclude that an arbitrator exceeded his or her authority when it is obvious from the written opinion.

Under these standards, we hold that the District Court was correct in concluding that Mechmann exceeded his authority. Although Mechmann's opinion begins by acknowledging that his authority is set forth in Section 9.3(e) of the LCOA, it contains only four paragraphs of substantive discussion—all of which focus on the way in which RPS communicated to Kayser that it was dissatisfied with his performance. See supra page 6. The conclusion that arbitrator Mechmann derived from this discussion was not that Kayser's termination had been contrary to the LCOA (the question actually before him), but rather that "the RPS system [was] lacking in due pr ocess toward [Kayser]." Kayser would have us believe that the arbitrator devoted four paragraphs to "mere dicta," but not one sentence to explaining his supposed "holding" that the termination violated the terms of the agreement. That reading is simply not supported by the arbitrator's opinion, which demonstrates, beyond peradventure, that Mechmann ruled on an issue that was not properly befor e him.

Moreover, as noted by RPS, the arbitrator never framed or decided the issue in the terms stated by the LCOA: "[W]hether the termination of [Kayser] was within the terms of this Agreement." Instead, Mechmann stated that "[t]he main question" was whether "the termination" was "wrongful or proper." And Mechmann's "conclu[sion]" was "that this was wrongful termination by RPS of the LCOA," not that the termination violated "the ter ms of " the LCOA. Though these latter two references, standing alone, would not suffice to show that the arbitrator exceeded his authority, they lend further support to our conclusion that

24

he did so. We hold that the District Court was correct to vacate the arbitrator's award, and will ther efore affirm its order.9

_____

9. Our affirmance of the District Court's vacatur order gives rise to a controversy as to whether Kayser may seek r earbitration. The FAA provides that "[w]here an awar d is vacated and the time within which the agreement required the award to be made has not expired, the court may, in its discretion, direct a r ehearing by the arbitrators." 9 U.S.C. S 10(a). As our previous discussion indicates, the arbitrator's opinion is unclear as to whether he ruled on the issue that was before him: whether RPS's termination of Kayser's contract was within the terms of LCOA. Under these circumstances, rehearing would seem appropriate. But query whether "the time within which the agr eement required the award to be made has . . . expired." Though the LCOA itself sets no particular date by which an award must be enter ed, the parties agreed to "arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association [(AAA or Association)]." LCOA S 9.3. The question seems to be, therefore, whether AAA rules impose an outer time limit, and that may well be a matter better r esolved by the Association. We do not decide these difficult issues, which are not before us, but leave them for any further proceedings that may occur.

If a rearbitration occurs in this matter , we note for guidance that all members of the panel are in agreement that, at all events, the arbitrator's award should have been reduced to no more than $129,930.00--the amount Kayser originally sought to compensate him for his "lost profits." According to Section 9.3(e) of the LCOA, Kayser was
entitled to damages only for his "net ear nings . . . during the period between the date of termination to the last day of the term of this Agreement." As noted in the text, Kayser originally sought $141,961.40 ($129,930.00 in lost profits and $12,031.40 for purchasing a truck at the behest of RPS), but the arbitrator awarded him $174,431.15. We are satisfied that the truck purchase was plainly outside the scope of allowable damages and can find no support in the r ecord for the arbitrator's award of $32,469.75 mor e than Kayser originally requested. That being said, the panel expresses no opinion as to whether an award of $129,930.00 was justified in this case.

25

AMBRO, Circuit Judge, Concurring:

I concur in the outcome reached by my colleagues. I agree that the arbitrator in this case exceeded his authority in making the award in favor of Mr. Kayser against Roadway Package System, Inc. ("RPS"). In arriving at this result, I agree that the Federal Arbitration Act (the "FAA"), 9 U.S.C. S 1 et seq., permits parties by private agreement to contract around the FAA's standar ds by which arbitrators' awards are vacated. I also agree that whether the parties have contracted out of the FAA's vacatur of awards standard is a matter of contract construction. 1 But I disagree with my colleagues' conclusion that, as a matter of contract construction, the parties' choice of Pennsylvania law to govern the Linehaul Contractor Operating Agreement (the "LCOA") requires that the F AA, and not Pennsylvania law, provide the standard of judicial r eview to be applied to that contract's arbitration provision (which makes no mention of a governing law). In determining that the FAA requires that the LCOA contain a "clear intent" to have Pennsylvania law govern its arbitration pr ovision, or else by default the FAA applies, my colleagues, I believe, misapply our Supreme Court's decision in Mastrobuono v. Shearson Lehman Hutton, Inc., 514 U.S. 52 (1995), and disregard custom and practice among the drafters of agr eements.

A. The FAA

The issue of the FAA's preemption of state arbitration law is a subject of considerable debate. See, e.g. , id. at 52, 56; Volt Info. Scis., Inc. v. Bd. of Trustees of the Leland Stanford Junior Univ., 489 U.S. 468, 472 (1989); Maj. Op. at 15 n.4.

_____

1. My colleagues use "contract construction" instead of "contract interpretation," and I presume they do so deliberately. Under contract construction a court construes the effect of an agreement under applicable law. Contract interpretation is the attempt by a court to ascertain the intent of the parties to an agr eement by the words they use to express that agreement. The for mer is a matter of law, the latter one of fact. See John F. Harkins Co., Inc. v. Waldinger Corp., 796 F.2d 657, 659–60 (3d Cir. 1986); Ram Const. Co. v. Am. States Ins. Co., 749 F.2d 1049, 1052–53 (3d Cir. 1984); see generally Edwin W. Patterson, The Interpretation and Construction of Contracts , 64 Colum. L. Rev. 833, 835 (1964); 3 Corbin on Contracts S 534, at 9 (1960).

26

Interestingly, the FAA was enacted in 1925 for the purpose of "overcom[ing] courts' refusals to enforce agreements to arbitrate." Allied--Bruce Terminix Cos. v. Dobson, 513 U.S. 265, 270 (1995). But this obvious pro-arbitration policy does not operate without regard to the intent of the parties to an agreement to arbitrate. Parties may choose that their arbitration be governed by rules other than those supplied by the FAA, Volt, 489 U.S. at 479, and the FAA "simply requires courts to enforce [those] privately negotiated agreements . . . in accordance with their terms." Id. at 478.

B. Supreme Court Jurisprudence--Volt and
        Mastrobuono

Our Supreme Court has twice within the last twelve years dealt with the deceptively difficult issue of whether the FAA impliedly governs an agreement to arbitrate within a contract specifically chosen by the parties to be governed by state law. See Mastrobuono, 514 U.S. at 52; Volt, 489 U.S. at 468. In Volt, the Supr eme Court held that the FAA did not preempt a contract's super-generic2 choice of "the law of the place where the Project is located" (in that case, California). Ruling that "where the parties have agreed that their arbitration agreement will be gover ned by the law of California," a California court, pursuant to its state arbitration law, could stay the arbitration pending the results of related litigation involving third parties, something the FAA does not contemplate and thus would not permit if it governed. Volt, 489 U.S. at 470. "Where, as here, the parties have agreed to abide by state rules of arbitration, enforcing those rules accor ding to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward." Id. at 479. That is because "[a]rbitration under the[FAA] is a matter of consent, not coercion." Id. Understood this way, where parties have a generic choice-of-law provision governing

_____

2. My colleagues refer to a generic choice of law as an agreement that states that it will be governed by the laws of a particular jurisdiction (in
this case, Pennsylvania). In Volt, no particular jurisdiction was listed in
the agreement under review. Thus, if our case involves a generic choice of law, Volt pertains to a super-generic choice of law.

27

their contract, they must affirmatively choose to have their agreement to arbitrate governed by the FAA. The only exception would be if the state rule chosen "would undermine the goals and policies of the FAA." Id. at 478.

Mastrobuono, decided only six years after Volt, held, in the context of a form contract containing a generic New York choice-of-law provision and a separate arbitration provision, that the FAA (which per mitted punitive damages awards by arbitrators) preempted New York law (which did not). The Supreme Court determined that New York law would govern substantive principles of the agr eement but could not provide, by the use of generic choice-of-law language alone, "special rules limiting the authority of the arbitrator." Mastrobuono, 514 U.S. at 64. Mastrobuono did not purport to reverse or even limit Volt. Instead, the Court distinguished Volt in a footnote:

> In Volt . . . we deferred to the California court's construction of its own state's law . . . . In the present case, by contrast, we review a federal court's interpretation of this contract, and our interpretation accords with that of the only decision-maker ar guably entitled to deference--the arbitrator .3

_____

3. Ironically, the Supreme Court pointed out in Mastrobuono that it would decide the case "the same under either a de novo or a deferential standard." Mastrobuono, 514 U.S. at 55 n.1. Moreover, Mastrobuono's effort to distinguish Volt has received strong criticism. See Thomas A. Diamond, Choice of Law Clauses and Their Preemptive Effect on the Federal Arbitration Act: Reconciling the Supreme Court with Itself, 39 Ariz.
L. Rev. 35, 56-58 (1997) ("This would suggest that Mastrobuono is applicable only when the choice of law clause's intended meaning is resolved in federal court. State courts would r emain free to ignore Mastrobuono while federal courts would be obligated to honor it. When the Supreme Court held in Southland Corp. v. Keating [465 U.S. 1 (1984)] that the provisions of the FAA must be honored by state courts as well as federal courts, it did so to assur e uniformity of law irrespective
of the selected forum. To hold otherwise would`encourage and reward forum shopping. . . . Furthermore, the Court's premise that a state court's interpretation of a choice of law clause is entitled to deference while a federal court's interpretation is subject to de novo review is insupportable.") (citations omitted); see also Heather J. Haase, Note, In Defense of Parties' Rights to Limit Arbitral Awards Under the Federal

Id. at 60 n.4.

Underlying the Court's decision in Mastrobuono is that "the wishes of the contracting parties" prevail, id. at 57 (citing Volt, 489 U.S. at 468), even if those wishes contravene the FAA by "an unequivocal exclusion of punitive damages claims." Id. at 60. In ascertaining those wishes, Mastrobuono instructs a court to take into account three principles of contract construction and interpretation. The first (which is in line with Volt , 489 U.S. at 478) is that the application of the law chosen would not under mine (absent express agreement) the goals and policies of the FAA. Id. at 56 ("New York's prohibition against arbitral awards of punitive damages . . . is a vestige of the `ancient' judicial hostility to arbitration."). The second principle is that, by placing in its contract a generic choice of law and an arbitration provision without a specific choice of law, Shearson Lehman "drafted an ambiguous contract, and . . . cannot now claim the benefit of the doubt." Id. at 63. Finally, "a document should be read to give effect to all its provisions and to render them consistent with each other." Id. Each of these principles is discussed below in the context of this case.

The difference between Volt  and Mastrobuono, "while there, is difficult to grasp." Lanier v. Old Republic Ins. Co., 936 F. Supp. 839, 844 (M.D. Ala. 1996). But these cases can, I believe, be reconciled. Taken together, they require that a substantive state arbitration rule (such as New York's barring of arbitrators awarding punitive damages) is superseded by the FAA where ther e is a conflict between the FAA and the state rule, though even that conflict can be overcome if dealt with explicitly in the contract. On the

_____

Arbitration Act: Mastrobuono v. Shearson Lehman Hutton, Inc., 31 Wake Forest L. Rev. 309, 331–32 (1996) ("Although purporting to follow Volt, the Supreme Court has ignored its own mandate in Volt to enforce `contractual rights and expectations of the parties,' and has instead distorted the meaning of the federal policy in or der to reach the conclusion that punitive damages should be allowed in arbitration.") (citations omitted); Joshua M. Barrett, Note, Federal Arbitration Policy After Mastrobuono v. Shearson Lehman Hutton, Inc., 32 Willamette L. Rev. 517, 534 (1996).

29

other hand, the FAA defers to procedural state arbitration rules (such as the California rule delaying an arbitration pending resolution of another matter in litigation), even when the FAA is in conflict. See Mastrobuono, 514 U.S. at 63–64 ("We think that the best way to har monize the choice-of-law provision with the arbitration pr ovision is to read `the laws of the State of New York' [in the choice-of-law provision] to encompass substantive principles that New York courts would apply, but not to include special rules limiting the authority of arbitrators."); Volt, 989 U.S. at 479 ("Where, as here, the parties have agr eed to abide by state rules of arbitration, enforcing those rules according to the terms of the agreement is fully consistent with the goals of the FAA, even if the result is that arbitration is stayed where the [FAA] would otherwise permit it to go forward."); Thomas A. Diamond, Choice of Law Clauses and Their Preemptive Effect on the Federal Arbitration Act: Reconciling the Supreme Court with Itself, 39 Ariz. L. Rev. 35, 60–65 (1997) (hereinafter "Diamond").

C. Our Case

Applied to our case, the issue is this: in a contract containing an arbitration provision making no mention of the FAA, is the affirmative choice of Pennsylvania law in a general choice-of-law clause enough to govern that entire contract, or does the FAA further require that the arbitration section of that contract explicitly choose Pennsylvania law again for its (and not the FAA's) arbitration procedures to apply? More specifically, the conflict is whether the FAA or the Pennsylvania Uniform Arbitration Act (the "PUAA")4 governs the parties' arbitration. This issue is easily resolved in favor of the PUAA if only Volt applies. But Mastrobuono creates the complexity. Consequently, I analyze our issue based on my reading of the principles of Volt  and Mastrobuono.

---

4. Under the PUAA, three types of arbitration are provided: (1) statutory, 42 Pa. Cons. Stat. SS 7301–7320; (2) common law, 42 Pa. Cons. Stat. SS 7341–7342; and (3) judicial, 42 Pa. Cons. Stat. SS 7361–7362. My colleagues and I agree that common law arbitration would be applicable if Pennsylvania law were to apply. See Maj. Op. at 8–9 n.2.

1. Application of the Principles of Volt and Mastrobuono

a. Law Chosen to Govern LCOA (Pennsylvania) Does Not Undermine FAA

In applying Volt and Mastrobuono to our case, the initial question is whether the application of Pennsylvania law to the arbitration section of the LCOA undermines the FAA. This requires, in my view, preliminary consideration of whether vacating an arbitrator's award because the arbitrator exceeded his authority is procedural or substantive. If the former, the generic choice of Pennsylvania law to govern the LCOA means that the PUAA governs all aspects of arbitration. If substantive, we then must address whether the PUAA is in conflict with the FAA, for only then does the FAA preempt in our case.

I believe that vacating an arbitrator's awar d because the arbitrator exceeded his authority is procedural, see Hade v. Nationwide Ins. Co., 503 A.2d 980, 982 (Pa. Super. Ct. 1986), overruled on other grounds by Ostroff v. Keystone Ins. Co., 515 A.2d 584 (Pa. Super Ct. 1986) (" `Irregularity' refers not to the award itself, but to the process used in arriving at this award."); Diamond, 39 Ariz. L. Rev. at 62 & n.223, and thus the FAA defers to the generic choice of state law to govern such matters. But even if the vacatur of arbitrators' awards is substantive, Pennsylvania law is not in conflict with the FAA, for both the FAA and common law arbitration under the PUAA permit vacating or modifying arbitral awards in circumstances where the arbitrator exceeds his or her authority. Compare 9 U.S.C. S 10(a)(1) (allowing courts to vacate arbitrators' awards where "procured by corruption, fraud, or undue means"), and id. S 10(a)(4) (allowing vacatur where the arbitrator "exceeded [his or her] powers"), with 42 Pa. Cons. Stat. S 7341 (authorizing vacatur where "fraud, misconduct, corruption or other irregularity caused . . . an unjust [or] inequitable . . . award") (emphasis added). An "irregularity" under Pennsylvania common law arbitration can include that the arbitrator considered issues beyond the scope of the arbitration clause. See Hade, 503 A.2d at 983 ("Admittedly, a finding that the panel considered an issue beyond the

31

scope of the arbitration clause would support a modification of the award on appeal."). Thus, unlike my colleagues, I do not believe that judicial power under Pennsylvania common law arbitration to vacate awar ds is "so much narrower than the FAA's" vacatur standards. Maj. Op. at 8-9 n.2. In any event, any differ ences that may exist do not determine the outcome of this case, and thus the PUAA does not undermine the goals and policies of the FAA in this instance.

### b. LCOA Is Ambiguous and Must be Construed Against its Drafter (RPS)

Following the further teaching of Mastrobuono, a generic choice-of-law provision, coupled with an arbitration provision not electing any specific law in the same agreement, is ambiguous.5Mastrobuono, 514 U.S. at 62-63. Under the rule of contra proferentum, drafters (such as Shearson Lehman in Mastrobuono) "cannot now claim the benefit of the doubt" with respect to that ambiguity. Id. at 63. RPS is in the same boat rowing with the same oars. It alone drafted the LCOA and in it chose Pennsylvania law without mentioning the FAA in the arbitration section of that contract. It cannot now argue that what Mastrobuono found to be ambiguous should be interpreted in RPS's favor by applying the FAA to the vacatur of the arbitrator's award.

My colleagues find, in disregard of Mastrobuono (and, I believe, counterintuitively), that the choice of Pennsylvania law in the LCOA, coupled with a general arbitration provision that does not select a set of state arbitration rules, is by default a "not legally ambiguous" choice of the

_____

5. My colleagues conclude that Mastrobuono merely contains "a discussion that is premised on the assumption that the presence of a choice-of-law clause can render a contract ambiguous as to whether the parties intended to incorporate state arbitration rules into their agreement." Maj. Op. at 18; see also Maj. Op. at 18 n.6 ("[A]s we explained, the Mastrobuono Court assumed without deciding that the agreement was ambiguous."). What they ignor e is the following Shermanesque statement of Mastrobuono: "Respondents [Shearson Lehman, et al.] drafted an ambiguous document, and they cannot now claim the benefit of the doubt." Mastrobuono, 514 U.S. at 63.

FAA to govern the arbitration section. Maj. Op. at 18 n.6.
But even their own words belie this conclusion.

> Because the presence of a generic choice-of-law clause
> tells us little (if anything) about whether contracting
> parties intended to opt out of the FAA's default
> standards and incorporate one borrowed fr om state
> law, we need to establish a default rule, and the one
> we adopt is that a generic choice-of-law clause,
> standing alone, is insufficient to support a finding that
> contracting parties intended to opt out of the F AA's
> default standards.

Maj. Op. at 15. If a generic choice-of-law clause in an
agreement "tells us little if anything" about whether the
parties opted out of the FAA, then the plain words of the
agreement are unclear. Wher e something is unclear or
incapable of one possible meaning, it is ipso facto
ambiguous. Websters' Third New International Dictionary of
the English Language Unabridged 66 (1971); accord
Sumitomo Mach. Corp. of Am. v. AlliedSignal, Inc. , 81 F.3d
328, 332 (3d Cir. 1986) (an agreement is ambiguous if it is
"susceptible of more than one meaning"). To argue that
unclear is, by default, "not legally ambiguous," Maj. Op. at
18 n.6, is, at best, interestingly ironic.

My colleagues' attempt to answer this irony is that "a
generic choice-of-law clause is insufficient as a matter of
law to show that the contracting parties intended to
displace the FAA's default rules.6  As a result, the contract
is not legally ambiguous, and contra proferentum is
inapplicable." Id.

_____

6. My colleagues never state what the FAA's default rules are. Instead,
they posit by ukase what they determine to be the default rule for a
generic choice of law in an agreement containing an arbitration provision
not electing its own internal choice of law. Their default rule is that,
absent a "clear intent" to choose state law to govern an agreement's
arbitration provision, the FAA applies. Maj. Op. at 3, 11–13.

This default rule brings into focus where my colleagues and I part.
They read the FAA, presumably by some preemptive principle (though
they deny that this is a case of preemption, Maj. Op. at 12), as requiring
"clear intent" to displace it. But, as I note in this concurring opinion,
I
believe that Mastrobuono takes a mor e nuanced approach.

I do not understand this statement. Mastr obuono nowhere states that a generic choice of law is insufficient as a matter of law to show that the parties intended to displace the FAA. The Supreme Court's position is more subtle. When an agreement involving interstate commerce is affected, the FAA applies to enfor ce arbitration. If the agreement containing an arbitration provision has no choice of law, the FAA by default supplies the rules of arbitration. By contrast, if the agreement contains an arbitration section with no choice of law but a generic choice of state law for the entire agreement, that state law choice supplies (a) the procedural rules for arbitration even if the FAA is in conflict (the teaching of Volt) and (b) the substantive rules for the arbitration unless the F AA is in conflict and the agreement does not explicitly choose the conflicting substantive rule (the teaching of Mastrobuono).7

Thus, I do not agree with my colleagues that my approach "unduly complicate[s] the law in this area." Maj. Op. at 20. Rather, it comports with the Supr eme Court's rulings in Volt and Mastr obuono.

        c. Reading LCOA's Choice-of-Law and Arbitration
        Sections as Consistent

Finally, Mastrobuono counsels "that a document should be read to give effect to all its pr ovisions and to render them consistent with each other." Mastrobuono, 514 U.S. at 63. It is hardly internally inconsistent to determine that the choice of Pennsylvania law to govern the LCOA also governs its section on arbitration when that choice implicates a rule (which I believe is procedural and in no event inconsistent with the FAA) relating to the standar d for reviewing an arbitrator's award.

_____

7. My colleagues write that any attempt to r econcile Volt and Mastrobuono is a "false premise," Maj. Op. at 19, and that I "craft a rule based on the assumption that the Supreme Court was wrong." Id. To the contrary, I believe that the Supreme Court itself supplies the reconciliation between these two cases. I would suggest, however, that in light of the Circuit split on this issue, see Maj. Op. at 19 n.7, the Supreme Court may wish to clarify its holding in Mastrobuono.

2. Custom and Practice Among Drafters of Agreements
Support the Determination that Pennsylvania Law
Governs the LCOA

Custom and practice among the drafters of agreements support my belief that the choice of Pennsylvania law in the LCOA governs the entire contract (including its arbitration provisions). In practice, choice-of-law provisions are often highly contested. They are almost always negotiated in only one provision of the agreement and usually at (as in the LCOA) or near the end of that agreement. The choice of law almost invariably is meant to encompass the entire agreement. Usually no thought is given to having a bifurcated choice of law, but if it is, the bifurcated choice of law is set forth in the choice-of-law provision itself.

If RPS had intended that the FAA apply to the arbitration section of the LCOA, it would have so stated. Moreover, to require within the arbitration section of the LCOA the redundant choice of Pennsylvania law leads logically to the conclusion that other provisions of the LCOA may also need to contain that redundant choice, e.g., provisions treating indemnification rights or termination events in contracts involving the interstate transportation of products. Thus, absent express preemption by the FAA,8 I believe that Pennsylvania law governs the LCOA's arbitration section.

* * * * *

Where does this leave us? We all agree that the intentions of contracting parties prevail over the FAA. I believe that the generic choice of state law to govern a contract also governs the arbitration provision within that contract when arbitration procedure is affected. The FAA preempts when substantive law is affected and the state law chosen conflicts with the FAA absent explicit agreement to override that preemption. The standard to be applied when vacating or modifying an arbitrator's award is, I submit, a procedural matter. Notwithstanding, the Pennsylvania law for vacating arbitrators' awards does not conflict with the FAA. Therefore the PUAA should apply to the LCOA's

---------------------------------------------------------------

8. There is none. Volt, 489 U.S. at 469 ("The FAA contains no express preemptive provision.").

35

arbitration provision. This result comports with Volt and Mastrobuono. Moreover, under Mastrobuono the contractual provisions here are ambiguous and must be construed against RPS, the drafter of the LCOA that chose only Pennsylvania law to govern it and now ar gues for the FAA as governing arbitration. Following this appr oach leaves the LCOA consistent internally.

One thing is certain to me. No default rule is called for by which an unclear intent (as my colleagues find) becomes transmogrified as legally unambiguous. In any event, when all analysis is done, the result is the same whether under Pennsylvania law or the FAA -- the arbitrator's award is vacated. Thus, I concur with the Court's judgment but not, in part, my colleagues' reasoning.

A True Copy:
Teste:

       Clerk of the United States Court of Appeals
       for the Third Circuit